UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | Case Number: |
| Plaintiff, | ) ) | **<u>CLASS ACTION COMPLAINT</u>** |
| vs. | ) ) ) | |
| WALGREEN CO., | ) ) | **<u>DEMAND FOR JURY TRIAL</u>** |
| Defendant. | ) ) ) ) | |

Plaintiff International Union of Operating Engineers Local 295-295c Welfare Fund ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), based on personal knowledge as to itself and upon information and belief and the investigation of its counsel as to all other matters, brings this class action against Defendant Walgreen Co. ("Walgreens"), and alleges the following:

## NATURE OF THE ACTION

1.      This action concerns Walgreens' deceptive and unfair scheme to artificially inflate the "usual and customary" prices Walgreens reported and used to charge customers and third-party payors for purchases of certain generic prescription drugs at Walgreens pharmacies.

2.      Walgreens is the second largest pharmacy chain in the United States, operating more than 8,000 retail pharmacies in all 50 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.[1] Walgreens interacts with ten million customers in its stores and online each day, and approximately 76% of the population of the United States lives within five miles of a Walgreens pharmacy.

3.      In fiscal year 2016, Walgreens filled over 928 million prescriptions on a 30-day adjusted basis and its United States retail pharmacy division earned approximately $83.8 billion in sales. Prescription drugs accounted for approximately 67% of those sales, and like other major retail pharmacies, generic drugs accounted for the vast majority of the total prescriptions dispensed by Walgreens. According to the Association for Accessible Medicines' *2017 Generic Drug Savings and Access in the U.S.* report, generic drugs accounted for 89% of prescriptions dispensed in the United States.

---

[1]     In September 2017, Walgreens announced it had received regulatory clearance to acquire over 1,900 stores from Rite Aid Corporation. This deal has yet to be consummated.

4.     A generic drug is a pharmaceutical drug that is the equivalent of a brand-name drug in dosage, strength, route of administration, quality, performance, and intended use.  Generic drugs typically cost less than their brand-name counterparts and have saved both consumers and health care plans hundreds of billions of dollars over the last decade.

5.     Approximately 90% of all United States citizens are enrolled in a private or public health care plan that covers some or all medical and pharmaceutical expenses.  In almost every one of these plans, the cost of prescription drugs is shared between the third-party payor (*i.e.*, the health insurance plan) and the actual user of the drug (*i.e.*, the plan participant).

6.     When a plan participant fills a prescription at a pharmacy under a third-party health care plan, the plan participant pays a portion of the cost directly to the pharmacy, either as a copayment, coinsurance, or contracted rate towards the plan's deductible ("copayment"), and the plan pays the remaining portion of the cost.  Because of the potential cost savings associated with the purchase of generic drugs, third-party payors incentivize plan participants to purchase generic drugs (if available) instead of brand-name drug equivalents by offering a lower price for generic drugs.

7.     For the reasons explained below (*see, e.g.*, ¶¶ 25-26, 29, 33), Walgreens cannot charge a customer or a third-party payor a higher price for a prescription drug than its "usual and customary" price, which is generally defined within the pharmaceuticals industry as the cash price offered to the general public (*i.e.,* the majority of cash paying customers) by the pharmacy for the same drug.  Walgreens, however, has knowingly and intentionally charged prices for certain generic drugs that well exceed the "usual and customary" price, resulting in falsely inflated payments by third-party payors and falsely inflated copayments by customers.

8.     The lynchpin of Walgreens' scheme is its Prescription Savings Club ("PSC"), a prescription savings program that allows cash-paying customers – those who pay for drugs without using insurance – to purchase certain prescription generic drugs at discounted prices.  Specifically,

the PSC allows cash-paying customers to purchase 500 commonly prescribed generic drugs listed on Walgreens' special formulary (attached hereto as Exhibit A) at tiered prices levels of $5, $10, and $15 for 30-day prescriptions and $10, $20, and $30 for 90-day prescriptions (the "PSC Prices").

9. The PSC prices are the cash prices offered to the general public and therefore constitute the "usual and customary" prices. Indeed, any customer of Walgreens pharmacies, except for Medicare or Medicaid beneficiaries,[2] is eligible to participate in the PSC. Walgreens does not otherwise limit eligibility for, or duration of the availability of, the PSC Prices for the prescription generic drugs at issue – ***other than prohibiting PSC participants from using insurance when purchasing the drugs***.

10. Accordingly, Walgreens was required to report to third-party payors the PSC Prices as Walgreens' "usual and customary" prices for the prescription generic drugs. However, since the PSC was created in 2007, Walgreens has purposefully disregarded the PSC Prices in setting its "usual and customary" prices, and thereby falsely inflated the "usual and customary" prices reported to third-party payors for these drugs.

11. Walgreens has effectively created a discriminatory pricing scheme, whereby customers enrolled in the PSC who are not using insurance when purchasing a prescription generic drug are able to pay the lower PSC Price, while third-party payors and their beneficiaries must pay the higher and artificially inflated "usual and customary" price when the beneficiaries use insurance.

12. Therefore, the PSC not only allows Walgreens to maintain and increase its market share by fending off discounted prices from its competitors, but it also provides a mechanism for Walgreens to hide its actual "usual and customary" prices from third-party payors so that it can

---

[2] Walgreens excludes Medicare and Medicaid beneficiaries due to federal anti-kickback laws. On or around January 19, 2017, Walgreens signed a stipulation agreeing to pay more than $45 million to settle a *qui tam* action alleging "Walgreens knowingly solicited and allowed persons receiving benefits from [government programs] to enroll in the PSC program, in order to induce such person to self-refer their prescriptions to Walgreens' pharmacies, in violation of [federal law]."

continue to collect higher reimbursement payments from third-party payors and higher copayments from the plan participants.

13. By charging amounts for prescription generic drugs that are above the PSC Prices for those same drugs, Walgreens is overcharging plan participants and third-party payors. Accordingly, Walgreens' misconduct has caused Plaintiff and the other Class members to suffer significant monetary damages.

## JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 putative Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. The Court also has subject matter jurisdiction over Plaintiff and the proposed Class' claims pursuant to 28 U.S.C. §1367(a).

15. Venue is proper in this District pursuant to 28 U.S.C. §§1391(b)-(d) because a substantial part of the events or omissions giving rise to Plaintiff and the proposed Class' claims occurred in this District, and Walgreens is otherwise subject to personal jurisdiction in this District given its significant contacts to this District. Furthermore, Walgreens' scheme to implement the PSC and fraudulently inflate "usual and customary" pricing information was directed from Walgreens' Deerfield, Illinois headquarters.

## THE PARTIES

**Plaintiff**

16. Plaintiff International Union of Operating Engineers Local 295-295c Welfare Fund is located in Maspeth, New York. Plaintiff is an "employee welfare benefit plan" and "employee benefit plan" maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act, 29

U.S.C. §186(c)(5), and as defined by §§1002(1) and (3) of the Employee Retirement Income Security Act, 29 U.S.C. §1001, *et seq.* As such, Plaintiff is an entity entitled to bring suit in its own name pursuant to 29 U.S.C. §1132(d).

17.     Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees and established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees (collectively, "beneficiaries"). Plaintiff administers the health and welfare fund in Maspeth, New York and its beneficiaries who purchased generic prescription drugs are located in Connecticut, Delaware, Florida, Maryland, New Jersey, New York, Pennsylvania, Rhode Island, Puerto Rico, and Texas. Plaintiff's beneficiaries purchased thousands of medically necessary generic prescription drugs during the Class Period (as defined below) for personal use. Accordingly, Plaintiff is ultimately at risk and responsible for reimbursing or paying for beneficiaries' purchases of prescription drugs for their personal use. Plaintiff paid more for generic prescription drugs than it would have absent Walgreens' misconduct.

18.     Third-party payors, including Plaintiff, will continue to pay for beneficiaries' purchases of generic prescription drugs because those drugs are medically necessary, and thus, are non-discretionary purchases. As such, beneficiaries cannot, and are not required to, avoid future purchases of medically necessary, generic prescription drugs from Walgreens – their established pharmacy with which they have a standing relationship and prescription history.

**Defendant**

19.     Defendant Walgreen Co. is an Illinois corporation with its headquarters located at 200 Wilmot Road, Deerfield, Illinois. On December 31, 2014, Walgreens Boots Alliance, Inc. ("WBA") became the successor of Defendant Walgreen Co., pursuant to a reorganization whereby WBA

became the direct parent holding company of Walgreen Co., which, in turn, became a wholly owned subsidiary of WBA.

## BACKGROUND

### The Process for Paying for Prescription Drugs

20. The majority of Americans in the United States have a health care plan (either private or public) that covers all or a portion of their medical and pharmaceutical expenses, known as a third-party payor. Most plans require plan participants to pay a portion of their drug costs out-of-pocket. These out-of-pocket expenses include copayments.

21. Even though plan participants cannot and do not negotiate the prices charged by pharmacies such as Walgreens for prescription drugs, and further, do not negotiate the copayment price for a drug in any given transaction, they are required to pay to Walgreens a copayment amount in order to receive the prescription.

22. The National Council for Prescription Drug Programs ("NCPDP")[3] sets the industry standards for the electronic transmission of pharmacy claims to third-party payors.[4] Walgreens follows this uniform process at its pharmacies for each prescription drug transaction.

23. When a customer fills a prescription at a Walgreens pharmacy anywhere in the United States, the pharmacist or pharmacy technician enters the prescription information and any applicable insurance or benefit information into Walgreens' computerized claims. The pharmacist or pharmacy technician also enters in key information about the customer, such as his/her name. This information

---

[3]   NCPDP is a non-profit organization that develops industry standards for electronic healthcare transactions used in prescribing, dispensing, monitoring, managing, and paying for medications and pharmacy services. Its membership is made up of approximately 1,500 stakeholders from across the pharmaceutical industry, including pharmacies, pharmacists, health plans, and government agencies.

[4]   Congress has codified and adopted the NCPDP standards through federal legislation, including the Health Insurance Portability and Accountability Act ("HIPAA"), Medicare Modernization Act, and Health Information Technology for Economic and Clinical Health Act. For example, HIPAA requires uniform methods and codes for exchanging electronic information with health insurance plans. These standards are referred to as the NCPDP Telecommunications Standard. HIPAA also requires prescribers follow the NCPDP SCRIPT Standards when prescribing drugs under Medicare Part D.

is then sent to the customer's third-party payor (or its agent). Walgreens charges the customer the copayment at the time the customer makes the purchase and the third-party payor covers the remaining cost of the prescription.

24.     NCPDP provides a standardized form for Walgreens pharmacies to complete and send to third-party payors when filling prescriptions. The form includes Field No. 426-DQ, where Walgreens is required to report its "usual and customary" price of the prescription being filled. NCPDP defines the term "usual and customary" as the "[a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed."

25.     This definition of "usual and customary" price is followed by pharmacy benefits managers ("PBMs").[5] For instance, in 2015, Plaintiff's PBM, Express Scripts, Inc., defined "Usual and Customary Price" in its Pharmacy Benefit Management Agreement as "the retail price charged by a Participating Pharmacy for the particular drug in a cash transaction on the date the drug is dispensed as reported to [Express Scripts, Inc.] by the Participating Pharmacy." In addition, under its provider manual, "Usual and Customary Retail Price" includes "frequent shopper or special customer discounts or programs, competitor's matched price or any and all other discounts, special promotions, and programs causing a reduction in the price offered to that Member and offered by the Network provider (or any of its Pharmacies) on such date," and importantly, "must include any applicable discounts offered to attract customers including Members." Similarly, the 2014 provider manual of another PBM, OptumRx, defined the "usual and customary" price as "[t]he price, including all applicable customer discounts, such as special customer, senior citizen and frequent shopper discounts, that a cash paying customer pays Pharmacy for Drug Products, devices, products and/or supplies."

---

[5]     PBMs are basically middle men that go between the payors and other parties in the healthcare industry.

26.     Based on the data reported by Walgreens on NCPDP's standard forms, third-party payors identify the copayment amount that the customer must pay to Walgreens in a specific prescription transaction.  The copayment amount is a portion of the total drug price and cannot exceed the drug price.  In addition, the copayment cannot exceed Walgreens' "usual and customary" price of the drug.  After the copayment amount is paid by the customer, the remainder of the drug price is reimbursed to Walgreens by the third-party payor.

27.     In some situations, however, the copayment may only be charged as a percentage of the "usual and customary" price.  For instance, if a third-party payor's negotiated price for a specific drug is $40 with the customer responsible for 25% of the drug as his or her copayment, but the "usual and customary" price of the drug is only $20, the $20 price would take the place of the negotiated rate and the customer would only pay a copayment of $5 (25% of $20).

28.     Walgreens is well aware of both the definition of "usual and customary," and how the "usual and customary" price of a particular prescription drug is ascertained.  Indeed, as late as 2011, Walgreens owned Walgreens Health Initiative Inc. ("WHI"), a PBM that defined "usual and customary" in its manual as the "cash price [for the prescription drug] including all applicable customer discounts, coupons or sale price which a cash-paying customer would pay at the pharmacy."  In addition, WHI directed the pharmacies in its network to use the standard NCPDP form containing the "usual and customary" field discussed above.

**Big Box Retailers Exert Substantial Price Pressure on Generic Drugs**

29.     In 2006, large "big box" retailers with pharmacy departments began offering hundreds of generic prescription drugs at significantly reduced prices.  For example, in September 2006, Wal-Mart began charging $4 for a 30-day supply and $10 for a 90-day supply of the most commonly prescribed generic drugs.  In November of that same year, Target began charging $4 for a

30-day supply and $10 for a 90-day supply of such prescription generic drugs. Other retailers with pharmacy departments soon followed suit.

30.     Notably, in the wake of Wal-Mart's decision to substantially reduce the prices of its prescription generic drugs, the Center for Medicaid & Medicare Services ("CMS") specifically stated that it would treat Wal-Mart's new lower prices as the "usual and customary" prices for those drugs and use those prices as the basis for paying claims for prescription drug benefits.[6] Wal-Mart and Target properly reported to third-party payors these reduced prices as their "usual and customary" prices for the prescription generic drugs.

31.     Following the big box retailers' decision to reduce the prices of many prescription generic drugs, in 2007, Walgreens started the PSC discount drug program. Walgreens charges individuals $20 and families $35 per year to join the PSC. In exchange, Walgreens, through the PSC, allows cash-paying customers to purchase prescription generic drugs on its formulary list for $5, $10, and $15 for 30-day prescriptions and $10, $20, and $30 for 90-day prescriptions, depending on the drug's tier classification. There are over 500 generic drugs on the formulary list and the list encompasses a number of the most widely prescribed generic drugs.

32.     The PSC is not a special, limited, or one-time offer. It is also not a third-party plan, insurance, or a substitute for insurance. Rather, Walgreens has continuously offered the PSC for multiple benefit years. Importantly, *any* cash paying customers that are not on Medicare or Medicaid can join the PSC and avail themselves of the discounted prices.

33.     Accordingly, the price for prescription generic drugs that those enrolled in the PSC pay is the price that Walgreens offers to its customers (i.e., the general public), meaning the PSC Prices are the "usual and customary" prices for the prescription generic drugs on Walgreens' PSC

---

[6]     Centers for Medicare & Medicaid Servs., *Medicare Prescription Drug Benefit Manual*, Ch. 14-Coordination of Benefits, at 19 n.1 (2006), https://perma.cc/MW6A-H4P6.

formulary. Walgreens' own explanation of the "usual and customary" price, as adopted by WHI, mandates this determination.[7]

### A SPECIAL RELATIONSHIP EXISTS BETWEEN WALGREENS AND ITS CUSTOMERS, INCLUDING PLAINTIFF'S BENEFICIARIES

34. The relationship between a pharmacy and its customers is unique, special, and important. Pharmacists, including those at Walgreens, do more than just dispense medicine. Pharmacists discuss with customers how they should take medications, counsel customers on the use of medicine (whether over-the-counter or prescription), and advise customers on general health topics, such as diet and exercise. Trust is an essential component of the relationship between a pharmacist and a customer. For instance, a customer needs to trust a pharmacist that a generic drug is just as effective as its brand-name counterpart. Indeed, customers have come to expect such advice, and further, that pharmacists will provide them with ways to save money, such as using generics when available, without prompting.

35. Walgreens has acknowledged this special relationship. For instance, in an April 2012 press release, Kermit Crawford, Walgreens president of pharmacy, health and wellness, stated:

> The pharmacist-patient relationship can be very instrumental in helping to improve health outcomes because patients often are talking with their pharmacist more often than their primary care physician. Establishing a ***personal relationship*** with your pharmacist can help improve health outcomes by helping customers feel comfortable and confident in working with their pharmacist for information, advice and support.

Crawford then noted Walgreens' continued efforts to develop this personal and special relationship, by stating "[Walgreens is] focused on strengthening the relationship between our pharmacists and patients to provide the care and expert advice they deserve."

---

[7]   Just last year, the Seventh Circuit held that the "'usual and customary' price requirement should not be frustrated by so flimsy a devise as [a pharmacy's] 'discount program.'" *Garbe v. Kmart Corp.*, 824 F.3d 632, 643 (7th Cir. 2016).

36.     Walgreens also highlights this special relationship in its marketing. For instance, on its website, Walgreens states:

> An increasing number of our pharmacies offer a private consultation room for pharmacists to answer patient questions and provide immunizations, one of many ways we are providing personalized care and ***developing strong patient-pharmacist relationships.***
>
> *      *      *
>
> Walgreens specially-trained pharmacists and clinical support professionals have helped patients from diagnosis to better health through medication adherence programs customized to their unique health needs.

37.     Taken together, Walgreens outright acknowledges the vital and personal role pharmacists play in the day-to-day lives of their patients. Walgreens has taken affirmative steps to provide personalized care and strengthen the relationship between patients and pharmacists at Walgreens.

### WALGREENS FALSELY INFLATES ITS
### "USUAL AND CUSTOMARY" PRICE

38.     Although Walgreens sought to retain and attract cash-paying customers by offering discounted prices on prescription generic drugs through the implementation of the PSC program, it did not want to lose revenues by offering those same discounted prices to customers using insurance to make their prescription drug purchases.

39.     Thus, under the guise that its PSC program was not the price charged to the cash-paying general public, Walgreens continued to report its higher, pre-PSC "usual and customary" prices to third-party payors. By reporting the artificially inflated "usual and customary" prices to third-party payors, Walgreens was able to collect artificially inflated payments from third-party payors and artificially inflated copayments from third-party payors' beneficiaries.

40.     Walgreens knew that if the "usual and customary" price for a particular prescription drug was less than the negotiated price between Walgreens and the third-party payor, Walgreens

- 11 -

could not charge the third-party payor a drug price that was greater than the "usual and customary" price. Walgreens' knowledge of these facts cannot be denied given its market position and prior ownership of WHI, which dealt extensively with this issue as Walgreens' PBM.

41.     In addition to the knowledge garnered through its relationship with WHI, Walgreens knew the prices the limitations on prices it could charge to customers using insurance to purchase their prescription medications from its dealings and contractual relationships with the third-party payors. Indeed, third-party payors' (or their agents') pharmacy agreements and manuals define "usual and customary" pricing and state how a plan participant's copayment is determined. These agreements and manuals specifically contemplate a situation where the "usual and customary" price is less than the negotiated amount, and forbid Walgreens from charging a copayment in excess of the "usual and customary" price under such circumstances. Walgreens is in possession of these documents and is aware of their contents. Further, Walgreens' own transaction data contain reimbursements adjudicated under the above formula and other rules imposed by the third-party payors, all which reflect general industry standards.

42.     Moreover, Walgreens need look no further than to its direct competitors, such as Wal-Mart, Target, and Costco, who all, on information and belief, correctly report the discounted prices offered through their respective prescription drug savings programs as their "usual and customary" prices.

43.     Walgreens circumvented its contractual obligations and industry standards  by implementing the PSC program, and instead of reporting the lower PSC Prices to third-party payors, knowingly and intentionally reporting false and inflated "usual and customary" prices. In doing so, Walgreens created a new category of cash-paying customers—those purchasing prescription generic medications through the PSC—while avoiding the lowering of drug prices charged to third-party payors and their plan participants.

- 12 -

44. As previously explained, the PSC Prices for the cash-paying customers are the actual "usual and customary" prices charged by Walgreens for the prescription generic drugs on the PSC formulary. Nonetheless, Walgreens continues to submit the higher, non-PSC prices as its purported "usual and customary" price to third-party payors.

45. Walgreens' scheme is made possible because third-party payors do not know whether the price Walgreens submits as its "usual and customary" price is actually the price offered to the cash-paying general public, or an artificially inflated amount.

46. On information and belief, the majority of customers who purchase the prescription generic drugs that are contained in the PSC formulary do so using the PSC program, and thus, the majority of Walgreens' cash-paying customers pay the PSC Prices for such drugs.

47. In failing to report the more common PSC Prices as its "usual and customary" prices, Walgreens continues to report prices that are significantly higher than the prices it offers to the general public.

48. Beginning in 2007, and continuing through the present, Walgreens has reported to third-party payors artificially inflated "usual and customary" prices for the same prescription generic drugs that Walgreens offers for lower prices under the PSC program. Walgreens has thereby caused (and continues to cause) plan participants to pay false and inflated copayments for prescription generic drugs, and third-party payors (including Plaintiff and other Class members) to pay the false and inflated remaining amounts for these prescriptions.

49. On information and belief, there have been millions of instances where Walgreens intentionally submitted fraudulently inflated "usual and customary pricing" information to third-party payors, such as Plaintiff, in connection with prescription generic drug purchases made by customers, such as Plaintiff and other members of the Class, during the class period.

- 13 -

50.     For example, through its fraudulent pricing scheme, Walgreens has overcharged Plaintiff, and as a result, Plaintiff has overpaid for generic prescription drugs.  Examples of such overpayments by Plaintiff are indicated in the below chart:

| Prescription | Purchase Date | Days' Supply | PSC Tier | Plan Paid | PSC Price |
|---|---|---|---|---|---|
| Rx1 | 10/28/09 | 30 | 2 | $38.96 | $10 |
| Rx2 | 05/20/10 | 30 | 2 | $28.08 | $10 |
| Rx3 | 05/26/10 | 30 | 1 | $22.84 | $5 |
| Rx4 | 03/20/12 | 30 | 2 | $13.48 | $10 |
| Rx5 | 04/04/14 | 30 | 2 | $13.48 | $10 |

## CLASS ALLEGATIONS

51.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of itself and the following National Class and State Subclasses:

### NATIONAL CLASS

All entities in the United States and its territories who, during the applicable liability period from January 2007 to the present ( "Class Period"), purchased and/or paid for some or all of the purchase price for generic prescription drugs that Walgreens included in its PSC formulary for consumption by their members, employees, insureds, participants, or beneficiaries.  For purposes of the Class definition, entities "purchased" generic prescription drugs that Walgreens included in its PSC formulary if they paid or reimbursed some or all of the purchase price.

### STATE SUBCLASSES

All entities in Connecticut, Delaware, Florida, Maryland, New Jersey, New York, Pennsylvania, Rhode Island, Puerto Rico, and Texas who, during the Class Period, purchased and/or paid for some or all of the purchase price for generic prescription drugs that Walgreens included in its PSC formulary for consumption by their members, employees, insureds, participants, or beneficiaries.  For purposes of the Class definition, entities "purchased" generic prescription drugs that Walgreens included in its PSC formulary if they paid or reimbursed some or all of the purchase price.

The National Class and State Subclasses are collectively referred to as the "Classes."

52.     Excluded from the Classes are:

- 14 -

(a)     Walgreens, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns;

(b)     all governmental entities, except for governmental-funded employee benefit plans;

(c)     all persons or entities who purchased generic prescription drugs from Walgreens for purposes of resale; and

(d)     any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

53.     The Classes consist of thousands of third-party payors, making joinder impractical, in satisfaction of Fed. R. Civ. P. 23(a)(1).  The exact size of the Classes, and the identities of the individual members thereof, are ascertainable through Walgreens' records including, but not limited to, its billing and collection records.

54.     The claims of Plaintiff are typical of the Classes.  The claims of Plaintiff and the Classes are based on the same legal theories and arise from the same improper and willful conduct, resulting in the same injury to the Plaintiff and the Classes.

55.     The Classes have a well-defined community of interest.  Walgreens has acted and failed to act on grounds generally applicable to the Plaintiff and the Classes, thus requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Classes.

56.     There are many questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2) and 23(b)(2).

57.     Common questions of fact and law affecting members of the Classes include, but are not limited to, the following:

(a)     whether Walgreens artificially inflated the "usual and customary" prices that it reported to third-party payors (including Plaintiff and the Classes);

(b)     whether Walgreens omitted and concealed material facts from their communications and disclosures with third-party payors and plan participants regarding its pricing scheme;

(c)     whether Walgreens has wrongfully overcharged and continues to overcharge copayments to hundreds of thousands, and likely millions, of plan participants who purchased a prescription generic drug listed on Walgreens' PSC formulary at its pharmacies around the country;

(d)     whether Walgreens has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts and/or practices in connection with the pricing and sale of prescription generic drugs;

(e)     whether, as a result of Walgreens' misconduct, Plaintiff and the Classes have suffered damages, and, if so, the appropriate measure of damages to which they are entitled; and

(f)     whether, as a result of Walgreens' misconduct, Plaintiff and the Classes are entitled to injunctive, equitable, and/or other relief, and, if so, the nature of such relief.

58.     Absent a class action, most of the members of the Classes would find the cost of litigating their claims to be prohibitive and will have no effective remedy.  The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

59.     Plaintiff will fairly and adequately represent and protect the interests of the Classes. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions.  Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the

other respective members of the Classes and have the financial resources to do so. Neither Plaintiff nor its counsel have any interests adverse to those of the other members of the Classes.

## TOLLING OF THE STATUTE OF LIMITATIONS

60.     Plaintiff and the other members of the Classes had neither actual nor constructive knowledge of the facts constituting their claims for relief until recently.

61.     Plaintiff and the other members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the actionable conduct alleged herein until recently.

62.     Walgreens engaged in a secret scheme that did not reveal facts that would have put Plaintiff or the other members of the Classes on inquiry notice that Walgreens was charging inflated prices for prescription generic drugs.

63.     Because Walgreens' scheme was kept secret, Plaintiff and the other members of the Classes were unaware of Walgreens' actionable conduct alleged herein and did not know that they were paying artificially inflated prices for prescription generic drugs during the Class Period.

64.     Walgreens actively concealed its generic drug pricing scheme from the public, including Plaintiff and the other members of the Classes, and failed to disclose the material fact that the prices Walgreens reported to third-party payors, such as Plaintiff, for the prescription generic drugs included on the PSC formulary were far higher than the PSC Prices, and thus, not the actual "usual and customary" prices for those drugs. Walgreens overcharged Plaintiff and the other members of the Classes for generic prescription drugs that reflected Walgreens' artificially inflated "usual and customary" prices. Walgreens also failed to post drug prices charged to the general public in a clear manner and in a way that would alert Plaintiff and the other members of the Classes to the artificially inflated prices charged by Walgreens. Through its actions, Walgreens misled

Plaintiff and the other members of the Classes and caused them to pay it inflated amounts for some of the most commonly prescribed generic drugs.

65.     Walgreens' affirmative acts alleged herein, including acts in furtherance of its scheme, were wrongfully concealed and carried out in a manner that precluded detection.

66.     Walgreens' pricing scheme was inherently self-concealing because it involved misrepresenting and falsely reporting the "usual and customary" prices for some of the most commonly prescribed generic drugs.  If Walgreens had been open and notorious about its deceptive and unfair fraudulent pricing scheme, it would never have succeeded.

67.     Plaintiff and the other members of the Classes could not have discovered the alleged improper activities at an earlier date by the exercise of reasonable diligence because Walgreens employed deceptive practices and techniques of secrecy to avoid detection of its activities. Walgreens concealed its activities by various means and methods, including affirmative misrepresentations regarding the actual "usual and customary" prices it charged for prescription generic drugs.

68.     Because Walgreens affirmatively concealed its scheme, Plaintiff and the other members of the Classes had no knowledge until recently of the alleged improper activities or information which would have caused a reasonably diligent person to investigate whether Walgreens committed the actionable activities detailed herein.

69.     As a result of Walgreens' active concealment, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and the other members of the Classes are entitled to assert as a result of the conduct alleged in this Complaint.

## FIRST CLAIM FOR RELIEF

### On Behalf of the National Class and
### State Subclasses for Fraud

70.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

71.     Plaintiff alleges this claim on behalf of itself and the National Class and State Subclasses.

72.     Walgreens materially misrepresented and concealed the true "usual and customary" prices of its generic prescription drugs.

73.     The true "usual and customary" price is material to Plaintiff and the National Class and State Subclasses because the misrepresentation and concealment of the true "usual and customary" price of their generic prescription drugs causes them to be unable to accurately evaluate the cost of the prescriptions being purchased and, in fact, causes them to overpay for those prescriptions.  Had they known Walgreens was reporting to and charging them inflated and false amounts, they would not have proceeded with the transactions.

74.     Walgreens made such misrepresentations and omissions to Plaintiff and the National Class and State Subclasses each time Walgreens reported and charged artificially inflated prices for its generic prescription drugs.

75.      Walgreens made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that Walgreens knew the prices it reported to third-party payors and charged to plan participants were substantially (and unjustifiably) higher than the prices Walgreens charged under its PSC program to the cash-paying general public.

76.     Walgreens intended to induce the Plaintiff and the members of the National Class and State Subclasses to rely on its misrepresentations and omissions. Walgreens knew that Plaintiff and the members of the Class would rely on the accuracy of the price Walgreens reported to and charged

- 19 -

them, and that Plaintiff and the members of the National Class and State Subclasses would consequently pay higher prices than the true "usual and customary" prices for their generic prescription drugs.

77.     Plaintiff and members of the National Class and State Subclasses justifiably relied on Walgreens' misrepresentations and omissions in that they would not have purchased or paid for generic prescription drugs from Walgreens at falsely inflated amounts but for Walgreens' misrepresentations and omissions.  Thus, Plaintiff and the National Class and State Subclasses' reliance on Walgreens' misrepresentations and omissions was to their detriment.

78.     As a proximate result of Walgreens' conduct, Plaintiff and the members of the National Class and State Subclasses have been damaged because they paid for generic prescription drugs at amounts that were far higher than the prices they would have paid but for Walgreens' misconduct.

79.     Walgreens is therefore liable to Plaintiff and the National Class and State Subclasses for the damages they sustained.

### SECOND CLAIM FOR RELIEF

**On Behalf of the National Class and
State Subclasses for Negligent Misrepresentation**

80.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

81.     Under the circumstances alleged, Walgreens owed a duty to Plaintiff and the National Class and State Subclasses to provide them with accurate information regarding the prices of its generic prescription drugs.

82.     Walgreens misrepresented and/or concealed the true "usual and customary" prices of generic prescription drugs that are included in the PSC program.  Walgreens made such

misrepresentations by reporting artificially inflated "usual and customary" prices for such drugs to third-party payors, such as Plaintiff and other members of the National Class and State Subclasses.

83. Walgreens had no reasonable grounds to believe that these misrepresentations and/or omissions were true. The prices that Walgreens reported to third-party payors were substantially (and unjustifiably) higher than the prices it charged under its PSC program to the cash-paying public.

84. Walgreens intended to induce Plaintiff and the National Class and State Subclasses to rely on its misrepresentations and/or omissions. Walgreens knew that Plaintiff and the National Class and State Subclasses would rely on its misrepresentations and/or omissions regarding "usual and customary" prices and, as a result, would pay higher prices than the actual "usual and customary" prices for those generic prescription drugs.

85. Plaintiff and the National Class and State Subclasses justifiably relied upon Walgreens' misrepresentations and/or omissions in that Plaintiff and the National Class and State Subclasses would not have purchased or paid for generic prescription drugs from Walgreens for more than the PSC prices but for Walgreens' misrepresentations and/or omissions. Plaintiff and the National Class and State Subclasses' reliance on Walgreens' misrepresentations and/or omissions was, thus, to their detriment.

86. As a proximate result of Walgreens' negligent conduct, Plaintiff and the National Class and State Subclasses have been damaged because they paid prices for generic prescription drugs that were far higher than the prices they would have paid but for Walgreens' misconduct.

87. Walgreens is therefore liable to Plaintiff and the National Class and State Subclasses for the damages they sustained.

### THIRD CLAIM FOR RELIEF

**On Behalf of the National Class and
State Subclasses for Unjust Enrichment**

88.     Plaintiff incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

89.     By means of Walgreens' wrongful conduct alleged herein, Walgreens knowingly overcharged third-party payors (such as Plaintiff) and plan participants for generic prescription drugs included in the PSC program in a manner that is unfair and unconscionable.

90.     Walgreens knowingly received and retained wrongful benefits and funds from Plaintiff and the National Class and State Subclasses.  In so doing, Walgreens acted with conscious disregard for the rights of Plaintiff and the National Class and State Subclasses.

91.     As a result of Walgreens wrongful conduct as alleged herein, Walgreens has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the National Class and State Subclasses.

92.     Walgreens' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

93.     Under the common law doctrine of unjust enrichment, it is inequitable for Walgreens to be permitted to (without justification) retain the benefits it received, and is still receiving, from the imposition of artificially inflated prices on Plaintiff, the National Class and the State Subclasses in an unfair and unconscionable manner.  Walgreens' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

94.     Plaintiff and the National Class and State Subclasses did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for Walgreens to retain these wrongfully obtained proceeds.

95.     Walgreens is therefore liable to Plaintiff and the National Class and State Subclasses for restitution in the amount of Walgreens' wrongfully obtained profits.

## FOURTH CLAIM FOR RELIEF

### On Behalf of the Connecticut Subclass for
### Violation of the Connecticut Unfair Trade Practices Act[8]

96.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.     Plaintiff brings this claim individually and on behalf of the members of the Connecticut Subclass.

98.     Walgreens, Plaintiff, and other members of the Connecticut Subclass are "persons" within the meaning of Conn. Gen. Stat. Ann. §42-110a(3).

99.     Walgreens' transactions with Plaintiff and the Connecticut Subclass were "trade" or "commerce" within the meaning of Conn. Gen. Stat. Ann. §42-110a(4).

100.     Plaintiff and the other members of the Connecticut Subclass have been damaged by Walgreens' unfair and/or deceptive practices in the conduct of trade or commerce, in violation of Conn. Gen. Stat. Ann. §42-110a, *et. seq.* in connection with the sale of generic prescription drugs by Walgreens to Plaintiff and the Connecticut Subclass.  These unfair and/or deceptive practices, included, among other things:

(a)     reporting to and charging Plaintiff and the Connecticut Class fraudulently inflated "usual and customary" prices for generic prescription drugs sold by Walgreens;

(b)     communicating to and charging the beneficiaries of Plaintiff and the Connecticut Subclass (or its beneficiaries) fraudulently inflated copayments that exceeded Walgreens' true "usual and customary" price;

---

[8]     Conn. Gen. Stat.§42-110a, *et. seq.*

(c) concealing from Plaintiff and the Connecticut Subclass the true "usual and customary" prices of generic prescription drugs, and the proper reimbursement amount Plaintiff and the Connecticut Class should have paid; and

(d) wrongfully obtaining monies from Plaintiff and the Connecticut Subclass as a result of Walgreens' deception.

101. Walgreens willfully engaged in the unfair and/or deceptive practices described above and knew or should have known that those practices were unfair and/or deceptive.

102. The facts which Walgreens misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Plaintiff and the Connecticut Subclass' decisions about whether to purchase or pay for generic prescription drugs from Walgreens, in that Plaintiff and the Connecticut Subclass would not have purchased or paid for generic prescription drugs from Walgreens for more than the PSC Prices but for Walgreens' unfair and/or deceptive acts and/or practices.

103. As a direct and proximate result of Walgreens' unfair and deceptive acts and/or practices, Plaintiff and the Connecticut Subclass were deceived into paying falsely inflated prices for generic prescription drugs and have been damaged thereby. Plaintiff and the other members of the Connecticut Subclass therefore seek injunctive relief pursuant to Conn. Gen. Stat. Ann. §42-110g(d), to enjoin Walgreens' ongoing wrongful acts described herein.

104. Walgreens are therefore liable to Plaintiff and the Connecticut Subclass for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

### FIFTH CLAIM FOR RELIEF

**On Behalf of the Delaware Subclass for
Violation of the Delaware Consumer Fraud Act[9]**

105.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.   Plaintiff brings this claim individually and on behalf of the members of the Delaware Subclass.

107.   Walgreens, Plaintiff, and other members of the Delaware Subclass are "persons" within the meaning of 6 Del. C. §2511(7).

108.   The generic prescription drugs that Plaintiff and other members of the Delaware Subclass purchased from Walgreens are "merchandise" within the meaning 6 Del. C. §2511.

109.   Walgreens' transactions with Plaintiff and other members of the Delaware Subclass were "sales" within the meaning of 6 Del. C. §2511(8).

110.   Plaintiff and the other members of the Delaware Subclass have been damaged by Walgreens' act, use and/or employment of deception, fraud, false pretense, false promise, misrepresentation, and/or the concealment, suppression, or omission of material facts, in violation of 6 Del. C. §2511, *et seq.*, in connection with the sale of generic prescription drugs by Walgreens to Plaintiff and the Delaware Subclass, including, among other things:

(a)   reporting to and charging Plaintiff and the Delaware Class fraudulently inflated "usual and customary" prices for generic prescription drugs sold by Walgreens;

(b)   communicating to and charging the beneficiaries of Plaintiff and the Delaware Subclass (or its beneficiaries) fraudulently inflated copayments that exceeded Walgreens' true "usual and customary" price;

---

[9]   6 Del. C. §2511, *et. seq.*

(c) concealing from Plaintiff and the Delaware Subclass the true "usual and customary" prices of generic prescription drugs, and the proper reimbursement amount Plaintiff and the Delaware Class should have paid; and

(d) wrongfully obtaining monies from Plaintiff and the Delaware Subclass as a result of Walgreens' deception.

111. Walgreens made these misrepresentations and omissions knowingly given that Walgreens knew the prices it reported to third-party payors and charged to plan participants were substantially (and unjustifiably) higher than the prices Walgreens charged under its PSC program to the cash-paying public.

112. The facts which Walgreens misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Plaintiff and the Delaware Subclass' decisions about whether to purchase or pay for generic prescription drugs from Walgreens, in that Plaintiff and the Delaware Subclass would not have purchased or paid for generic prescription drugs from Walgreens for more than the PSC Prices but for Walgreens' improper practices.

113. Further, Walgreens intended to induce Plaintiff and the Delaware Subclass to rely on its misconduct. Walgreens knew that Plaintiff and the Delaware Subclass would rely on the accuracy of the price Walgreens reported to and charged them, and that, as a result, Plaintiff and the Delaware Subclass would pay higher than the true "usual and customary" prices for its generic prescription drugs. Plaintiff and the Delaware Subclass did in fact justifiably rely on Walgreens' misconduct in that Plaintiff and the Delaware Subclass would not have purchased or paid for generic prescription drugs from Walgreens at falsely inflated amounts but for Walgreens' misconduct. Thus, Plaintiff and the New Jersey Subclass' reliance on Walgreens' misconduct was to their detriment. Therefore, Walgreens engaged in unlawful practices within the meaning of 6 Del. C. §2513(a).

114.     As a proximate result of Walgreens' conduct, Plaintiff and the members of the Delaware State Subclasses have been damaged because they paid for generic prescription drugs at amounts that were far higher than the prices they would have paid but for Walgreens' misconduct.

115.     Walgreens are therefore liable to Plaintiff and the Delaware Subclass for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## SIXTH CLAIM FOR RELIEF

**On Behalf of the Florida Subclass for
Violation of the Florida Deceptive and Unfair Trade Practices Act[10]**

116.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.     Plaintiff brings this claim individually and on behalf of the members of the Florida Subclass.

118.     Plaintiff and the Florida Subclass are "consumers" within the meaning of Fla. Stat. §501.203(7).

119.     Walgreens' transactions with Plaintiff and the Florida Subclass as described herein are "trade or commerce" within the meaning of Fla. Stat. §501.203(8).

120.     Plaintiff and the Florida Subclass suffered damages as a consequence of Walgreens' knowing and intentional use and employment of unconscionable, deceptive, or unfair acts or practices in connection with the sale of generic prescription drugs to Plaintiff and the Florida Subclass, including, among other things:

(a)     reporting to and charging Plaintiff and the Florida Class fraudulently inflated "usual and customary" prices for generic prescription drugs sold by Walgreens;

---

[10]     Fla. Stat. §501.201, *et seq*.

(b)     communicating to and charging the beneficiaries of Plaintiff and the Florida Subclass (or its beneficiaries) fraudulently inflated copayments that exceeded Walgreens' true "usual and customary" price;

(c)     concealing from Plaintiff and the Florida Subclass the true "usual and customary" prices of generic prescription drugs, and the proper reimbursement amount Plaintiff and the Florida Class should have paid; and

(d)     wrongfully obtaining monies from Plaintiff and the Florida Subclass as a result of Walgreens' deception.

121.    Walgreens willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unconscionable, unfair and/or deceptive and in violation of Fla. Stat. §501.201, *et seq*.

122.    As a direct and proximate result of Walgreens' unfair and deceptive acts and practices, Plaintiff and the Florida Subclass have paid falsely inflated prices for generic prescription drugs and have been damaged thereby.

123.    Walgreens therefore is liable to Plaintiff and the Florida Subclass for the damages they sustained, plus statutory damages (including treble damages), penalties, injunctive relief, costs, and reasonable attorneys' fees to the extent provided by law.

## **SEVENTH CLAIM FOR RELIEF**

### **On Behalf of the Maryland Subclass for Violation of the Maryland Consumer Protection Act[11]**

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

---

[11]     Md. Comm. L. Code §13-101, *et seq*.

125.     Plaintiff brings this claim individually and on behalf of the members of the Maryland Subclass.

126.     Plaintiff and other members of the Maryland Subclass are "consumers" within the meaning of Md. Com. L. Code §13-101(c).

127.     The generic prescription drugs that Plaintiff and other members of the Maryland Subclass purchased from Walgreens are "consumer goods" within the meaning of Md. Comm. L. Code §13-101(d).

128.     Walgreens is a "merchant" and "person" within the meaning of Md. Comm. L. Code §13-101(g) - (h).

129.     Walgreens' transactions with Plaintiff and other members of the Maryland Subclass were "sales" within the meaning of Md. Comm. L. Code §13-101.

130.     Plaintiff and the other members of the Maryland Subclass have been damaged by Walgreens' unfair and/or deceptive trade practices, in violation of Md. Comm. L. Code §13-101, *et seq.* in connection with the sale of generic prescription drugs by Walgreens to Plaintiff and the Maryland Subclass.  These unfair and/or deceptive practices, included, among other things:

(a)     reporting to and charging Plaintiff and the Maryland Class fraudulently inflated "usual and customary" prices for generic prescription drugs sold by Walgreens;

(b)     communicating to and charging the beneficiaries of Plaintiff and the Maryland Subclass (or its beneficiaries) fraudulently inflated copayments that exceeded Walgreens' true "usual and customary" price;

(c)     concealing from Plaintiff and the Maryland Subclass the true "usual and customary" prices of generic prescription drugs, and the proper reimbursement amount Plaintiff and the Maryland Class should have paid; and

- 29 -

(d)        wrongfully obtaining monies from Plaintiff and the Maryland Subclass as a result of Walgreens' deception.

131.    The above-described conduct by Walgreens was false and/or misleading in that it had the capacity, tendency, or effect of deceiving and/or misleading, and did in fact deceive and/or mislead, consumers such as Plaintiff and the Maryland Subclass. Therefore, Walgreens engaged in unfair or deceptive trade practices within the meaning of Md. Comm. L. Code §13-301(1).

132.    Walgreens' failure to state the above described material facts to consumers, such as Plaintiff and the Maryland Subclass, had a tendency to deceive and did, in fact, deceive consumers. The facts that Walgreens omitted were material to Plaintiff and the Maryland Subclass' decisions about whether to purchase or pay for generic prescription drugs from Walgreens, in that Plaintiff and the Maryland Subclass would not have purchased or paid for generic prescription drugs from Walgreens for more than the PSC Prices had Walgreens disclosed these material facts. Therefore, Walgreens engaged in unfair or deceptive trade practices within the meaning of Md. Comm. L. Code §13-301(3).

133.    Walgreens intended for consumers, including Plaintiff and the Maryland Subclass, to rely on the above-described deception, fraud, false pretense, false premise, misrepresentation, and/or knowing concealment, suppression, and/or omission of material facts.  Walgreens knew that Plaintiff and the Maryland Subclass would rely on the accuracy of the price Walgreens reported to and charged them, and that, as a result, Plaintiff and the Maryland Subclass would pay higher than the true "usual and customary" prices for its generic prescription drugs.  Plaintiff and the Maryland Subclass did in fact justifiably rely on Walgreens' conduct in that Plaintiff and the Maryland Subclass would not have purchased or paid for generic prescription drugs from Walgreens at falsely inflated amounts but for Walgreens' deception, fraud, false pretense, false premise, misrepresentation, and/or knowing concealment, suppression, and/or omission of material facts.

Therefore, Walgreens engaged in unfair or deceptive trade practices within the meaning of Md. Comm. L. Code §13-301(9).

134.    As a direct and proximate result of Walgreens' unfair and deceptive acts and/or practices, Plaintiff and the Maryland Subclass were damaged because they paid for generic prescription drugs at amounts that were far higher than the prices they would have paid but for Walgreens' misconduct.

135.    Walgreens are therefore liable to Plaintiff and the Maryland Subclass for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.  Plaintiff and the other members of the Maryland Subclass also seek injunctive relief pursuant to Md. Comm. L. Code §13-406, to enjoin Walgreens' ongoing wrongful acts described herein.

## EIGHTH CLAIM FOR RELIEF

### On Behalf of the New Jersey Subclass for
### Violation of the New Jersey Consumer Fraud Act[12]

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.    Plaintiff brings this claim individually and on behalf of the members of the New Jersey Subclass.

138.    Walgreens, Plaintiff, and other members of the New Jersey Subclass are "persons" within the meaning of N.J. Stat. §56:8-1(d).

139.    The generic prescription drugs that Plaintiff and other members of the New Jersey Subclass purchased from Walgreens are "merchandise" within the meaning of N.J. Stat. §56:8-1(c).

---

[12]    N.J. Stat. §56:8-1, *et seq.*

140.    Walgreens' transactions with Plaintiff and other members of the New Jersey Subclass were "sales" within the meaning of N.J. Stat. §56:8-1(e).

141.    Walgreens engaged in unlawful practices with the act, use and/or employment of unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, and/or the knowing, concealment, suppression, or omission of any material fact with the intent that others, such as Plaintiff and other members of the New Jersey Class, rely upon such concealment, suppression, or omission in connection with the sale of generic prescription drugs.  The aforementioned unlawful practices included, among other things:

        (a)    reporting to and charging Plaintiff and the New Jersey Class fraudulently inflated "usual and customary" prices for generic prescription drugs sold by Walgreens;

        (b)    communicating to and charging the beneficiaries of Plaintiff and the New Jersey Subclass (or its beneficiaries) fraudulently inflated copayments that exceeded Walgreens' true "usual and customary" price;

        (c)    concealing from Plaintiff and the New Jersey Subclass the true "usual and customary" prices of generic prescription drugs, and the proper reimbursement amount Plaintiff and the New Jersey Class should have paid; and

        (d)    wrongfully obtaining monies from Plaintiff and the New Jersey Subclass as a result of Walgreens' deception.

142.    Walgreens knowingly made these misrepresentations and omissions, given that Walgreens knew the prices it reported to third-party payors and charged to plan participants were substantially (and unjustifiably) higher than the prices Walgreens charged under its PSC program to the cash-paying public.

143.    The facts which Walgreens misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Plaintiff and the New Jersey Subclass' decisions about

whether to purchase or pay for generic prescription drugs from Walgreens, in that Plaintiff and the New Jersey Subclass would not have purchased or paid for generic prescription drugs from Walgreens for more than the PSC Prices but for Walgreens' unlawful practices.

144. Further, Walgreens intended to induce Plaintiff and the New Jersey Subclass to rely on its misrepresentations and omissions. Walgreens knew that Plaintiff and the New Jersey Subclass would rely on the accuracy of the price Walgreens reported to and charged them, and that, as a result, Plaintiff and the New Jersey Subclass would pay higher than the true "usual and customary" prices for its generic prescription drugs.

145. Plaintiff and the New Jersey Subclass did in fact justifiably rely on Walgreens' misrepresentations and omissions in that Plaintiff and the New Jersey Subclass would not have purchased or paid for generic prescription drugs from Walgreens at falsely inflated amounts but for Walgreens' misrepresentations and omissions. Plaintiff and the New Jersey Subclass' reliance on Walgreens' misrepresentations and omissions is, thus, to their detriment.

146. As a proximate result of Walgreens' conduct, Plaintiff and the members of the New Jersey Subclass have been damaged because they paid for generic prescription drugs at amounts that were far higher than the prices they would have paid but for Walgreens' misconduct.

147. Walgreens are therefore liable to Plaintiff and the New Jersey Subclass for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## NINTH CLAIM FOR RELIEF

### On Behalf of the New York Subclass, for
### Violation of New York Gen. Bus. Law §349[13]

148.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.     Plaintiff brings this claim individually and on behalf of the members of the New York Subclass.

150.     Plaintiff and the New York Subclass are "persons" within the meaning of N.Y. Gen. Bus. Law §349(h).

151.     At all relevant and material times as described herein, Walgreens was engaged in "the conduct of any business, trade or commerce" in New York within the meaning of N.Y. Gen. Bus. Law §349(a) with respect to the acts alleged herein.

152.     N.Y. Gen. Bus. Law §349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

153.     At all relevant times, Plaintiff and the New York Subclass are members of the public, with respect to paying for or purchasing generic prescription drugs from Walgreens pharmacies in New York. Further, the actions and transactions alleged herein substantially affected the people of New York, with thousands of beneficiaries and consumers in New York, such as Plaintiff and members of the New York Subclass, paying substantially higher prices for generic prescription drugs at Walgreens pharmacies in New York.

---

[13]     N.Y. Gen. Bus. Law §349, *et seq.*

154. Plaintiff and members of the New York Subclass paid for generic prescription drugs from Walgreens pharmacies in New York and thus the deceptive transactions alleged herein occurred in New York.

155. Plaintiff and the New York Subclass have suffered losses as a direct, foreseeable, and proximate result of Walgreens' employment of unfair or deceptive acts or practices in the course of its business, by, among other things:

(a) reporting to and charging Plaintiff and the New York Subclass fraudulently inflated "usual and customary" prices for generic prescription drugs sold by Walgreens;

(b) communicating to and charging the beneficiaries of Plaintiff and the New York Subclass fraudulently inflated copayments that exceeded Walgreens' true "usual and customary" price;

(c) concealing from Plaintiff and the New York Subclass the true "usual and customary" prices of generic prescription drugs, and the proper reimbursement amount Plaintiff and the New York Class should have paid; and

(d) wrongfully obtaining monies from Plaintiff and the New York Subclass as a result of Walgreens' deception.

156. Walgreens willfully and knowingly engaged in the deceptive trade practices described above and knew or should have known that those practices were deceptive in violation of N.Y. Gen. Bus. Law §349.

157. The facts that Walgreens misrepresented and concealed were material to the decisions of Plaintiff and the members of the New York Subclass about whether to pay for Walgreens' generic prescription drugs, in that they would not have paid for or purchased the generic prescription drugs but for Walgreens' false, deceptive, and fraudulent acts and practices, misrepresentations, and material omissions.

158.     Walgreens intended for Plaintiff and the members of the New York Subclass to pay for its generic prescription drugs in reliance upon Walgreens' false, deceptive, and fraudulent acts and practices, misrepresentations, and material omissions.

159.     Walgreens' misleading and deceptive acts and practices adversely impacted Plaintiff and the members of the New York Subclass, who are consumers of prescription drugs purchased from Walgreens, and therefore, constitute consumer-oriented conduct under N.Y. Gen. Bus. Law § 349 that resulted in actual and direct harm to Plaintiff and the New York Subclass.

160.     As a direct and proximate result of Walgreens' false, deceptive, and fraudulent acts and practices, misrepresentations, and material omissions, Plaintiff and the members of the New York Subclass were deceived into paying artificially inflated prices for generic prescription drugs and have been damaged thereby.

161.     Walgreens is therefore liable to Plaintiff and the members of the New York Subclass for the damages they sustained, plus statutory damages, penalties, injunctive relief, costs, and reasonable attorneys' fees to the extent provided by law.

## TENTH CLAIM FOR RELIEF

### On Behalf of the Pennsylvania Subclass for
### Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law[14]

162.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.     Plaintiff brings this claim individually and on behalf of the members of the Pennsylvania Subclass.

164.     Walgreens, Plaintiff, and other members of the Pennsylvania Subclass are "persons" within the meaning of 73 Pa. Stat. §201-2(2).

---

[14]     73 Pa. Stat. §201-1, *et seq.*

165.     Walgreens' transactions with Plaintiff and other members of the Pennsylvania Subclass were "trade" or "commerce" within the meaning of 73 Pa. Stat. §201-2.

166.     Plaintiff and the other members of the Pennsylvania Subclass have been damaged by Walgreens' "unfair or deceptive acts or practices" in violation of 73 Pa. Stat. §201-2, *et seq*. in connection with the sale of generic prescription drugs by Walgreens to Plaintiff and the Pennsylvania Subclass. These "unfair or deceptive acts or practices," included, among other things:

(a)     reporting to and charging Plaintiff and the Pennsylvania Class fraudulently inflated "usual and customary" prices for generic prescription drugs sold by Walgreens;

(b)     communicating to and charging the beneficiaries of Plaintiff and the Pennsylvania Subclass fraudulently inflated copayments that exceeded Walgreens' true "usual and customary" price;

(c)     concealing from Plaintiff and the Pennsylvania Subclass the true "usual and customary" prices of generic prescription drugs, and the proper reimbursement amount Plaintiff and the Pennsylvania Class should have paid; and

(d)     wrongfully obtaining monies from Plaintiff and the Pennsylvania Subclass as a result of Walgreens' deception.

167.     Walgreens willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unfair and/or deceptive.

168.     The facts which Walgreens misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Plaintiff and the Pennsylvania Subclass' decisions about whether to purchase or pay for generic prescription drugs from Walgreens, in that Plaintiff and the Pennsylvania Subclass would not have purchased or paid for generic prescription drugs from

Walgreens for more than the PSC Prices but for Walgreens' unfair and/or deceptive acts and/or practices.

169. As a direct and proximate result of Walgreens' unfair and deceptive acts and/or practices, Plaintiff and the Pennsylvania Subclass were deceived into paying falsely inflated prices for generic prescription drugs and have been damaged thereby.

170. As described above, Walgreens engaged in fraudulent and/or deceptive conduct that created a likelihood of confusion or of misunderstanding by consumers, such as Plaintiff and the Pennsylvania Subclass, and is therefore unfair or deceptive acts or practices within the meaning of 73 Pa. Stat. §201-2(4)(xxi).

171. Walgreens are therefore liable to Plaintiff and the Pennsylvania Subclass for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## ELEVENTH CLAIM FOR RELIEF

**On Behalf of the Rhode Island Subclass for
Violation of the Rhode Island Deceptive Trade Practices Act[15]**

172. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

173. Plaintiff brings this claim individually and on behalf of the members of the Rhode Island Subclass.

174. Walgreens, Plaintiff, and other members of the Rhode Island Subclass are "persons[s]" within the meaning of R.I. Gen. Laws §6-13.1-1.

175. Walgreens' transactions with Plaintiff and other members of the Rhode Island Subclass were "trade" or "commerce" within the meaning of R.I. Gen. Laws §6-13.1-1.

---

[15] R.I. Gen. Laws §6-13.1-1, *et seq.*

176.    Plaintiff and the other members of the Rhode Island Subclass have been damaged by Walgreens' "[u]nfair methods of competition and unfair or deceptive acts or practices" in violation of R.I. Gen. Laws §6-13.1-1, *et seq*. in connection with the sale of generic prescription drugs by Walgreens to Plaintiff and the Rhode Island Subclass.  These "[u]nfair methods of competition and unfair or deceptive acts or practices," included, among other things:

(a)    reporting to and charging Plaintiff and the Rhode Island Subclass fraudulently inflated "usual and customary" prices for generic prescription drugs sold by Walgreens;

(b)    communicating to and charging the beneficiaries of Plaintiff and the Rhode Island Subclass (or its beneficiaries) fraudulently inflated copayments that exceeded Walgreens' true "usual and customary" price;

(c)    concealing from Plaintiff and the Rhode Island Subclass the true "usual and customary" prices of generic prescription drugs, and the proper reimbursement amount Plaintiff and the Rhode Island Class should have paid; and

(d)    wrongfully obtaining monies from Plaintiff and the Rhode Island Subclass as a result of Walgreens' deception.

177.    The facts which Walgreens misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Plaintiff and the Rhode Island Subclass' decisions about whether to purchase or pay for generic prescription drugs from Walgreens, in that Plaintiff and the Rhode Island Subclass would not have purchased or paid for generic prescription drugs from Walgreens for more than the PSC Prices but for Walgreens' unfair and/or deceptive acts and/or practices.

178.    As a direct and proximate result of Walgreens' unfair and deceptive acts and/or practices, Plaintiff and the Rhode Island Subclass were deceived into paying falsely inflated prices for generic prescription drugs and have been damaged thereby.  Plaintiff and the Rhode Island

Subclass therefore seek injunctive relief pursuant to R.I. Gen. Laws §6-13.1-5(a), to enjoin Walgreens' ongoing wrongful acts described herein.

179.    The foregoing conduct by Walgreens created a likelihood of confusion or of misunderstanding by Plaintiff and the Rhode Island Subclass and is therefore unfair or deceptive acts or practices within the meaning of R.I. Gen. Laws §6-13.1-1(6)(xii).

180.    The foregoing acts or practice by Walgreens was also unfair and/or deceptive to consumers, such as Plaintiff and the Rhode Island Subclass, and is therefore unfair or deceptive acts or practices within the meaning of R.I. Gen. Laws §6-13.1-1(6)(xiii).

181.    Further, the foregoing methods, acts, or practices by Walgreens mislead or deceived members of the public, such as Plaintiff and the Rhode Island Subclass, in a material respect, and therefore constitute unfair or deceptive acts or practices within the meaning of R.I. Gen. Laws §6-13.1-1(6)(xiv).

182.    Walgreens is therefore liable to Plaintiff and the Rhode Island Subclass for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## **TWELFTH CLAIM FOR RELIEF**

### **On Behalf of the National Class and State Subclasses for Declaratory and Injunctive Relief**

183.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184.    Under the Declaratory Judgment Act, 28 U.S.C. §2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief based upon such a judgment.  The Court has broad authority to restrain acts, such as here, which are tortious and which violate the terms of the state statutes described in this complaint.

185.     During the Class Period, Walgreens' deceptive, inflated "usual and customary" pricing scheme has been uniformly implemented as part of a concerted, years-long, pervasive campaign to mislead third-party payors and plan participants. Such scheme is ongoing and continues to this day. Therefore, Plaintiff face a substantial and imminent risk of future harm and will be injured in the future.

186.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Walgreens conduct continues to violate the statutes and laws referenced herein.

187.     The Court should also issue corresponding injunctive relief enjoining Walgreens from conducting business through the unlawful, unfair, misleading, or deceptive business acts or practices, and other violations of law described in this Complaint.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff prays for judgment against Walgreens, and request as follows:

A.     That all Class members are owed at least the difference between the amount they paid and the "usual and customary" price offered to the general public for all prescriptions purchased during the life of the PSC program;

B.     That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, and declare that Plaintiff is a proper Class representative;

C.     That the Court grant permanent injunctive relief to prohibit Walgreens from continuing to engage in the unlawful acts, omissions, and practices described herein;

D.     That the Court award compensatory, consequential, and general damages in an amount to be determined at trial;

E.     That the Court order disgorgement and restitution of all earnings, profits,

- 41 -

compensation, and benefits received by Walgreens as a result of its unlawful acts, omissions, and practices;

F.      That the Court award statutory treble damages, and punitive or exemplary damages, to the extent permitted by law;

G.      That the unlawful acts alleged in this Complaint be adjudge and decreed to be a violation of the unfair and deceptive business acts and practices in violation of the consumer protection statutes alleged herein;

H.      That the Court enter declaratory judgment in favor of Plaintiff, as described above;

I.      That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees;

J.      That the Court award pre- and post-judgment interest at the maximum legal rate; and

K.      That the Court grant all such other relief as it deems just and proper.

## JURY DEMAND

Plaintiff hereby demand a trial by jury on all issues so triable.

DATED:  October 17, 2017                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP

                                            *s/ James E. Barz*
                        _____

                                            JAMES E. BARZ (IL Bar #6255605)
                                            FRANK RICHTER (IL Bar #6310011)
                                            200 South Wacker Drive, 31st Floor
                                            Chicago, IL  60606
                                            Telephone:  312/674-4674
                                            312/674-4676 (fax)
                                            jbarz@rgrdlaw.com
                                            frichter@rgrdlaw.com

                                            ***Local Counsel***

- 42 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
MARK J. DEARMAN
STUART A. DAVIDSON
JASON H. ALPERSTEIN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
mdearman@rgrdlaw.com
sdavidson@rgrdlaw.com
jalperstein@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
MARIO ALBA, JR.
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
malba@rgrdlaw.com

ROBBINS ARROYO LLP
GEORGE C. AGUILAR
GREGORY E. DEL GAIZO
STEVEN M. MCKANY
600 B Street, Suite 1900
San Diego, CA  92101
Telephone:  619/525-3990
619/525-3991 (fax)
gaguilar@robbinsarroyo.com
gdelgaizo@robbinsarroyo.com
smckany@robbinsarroyo.com

*Attorneys for Plaintiff*